# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APRIL D. MOLCHAN | : |
| | : |
|    Plaintiff, | : |
| | : |
| v. | :   CIVIL ACTION NO. |
| | : |
| DELMAR FIRE DEPARTMENT, INC., | :   TRIAL BY JURY DEMANDED |
| DELMAR, DELAWARE, | : |
| a Delaware Corporation, TOWN OF | : |
| DELMAR, a Delaware Municipal | : |
| Corporation, and ANDREW REMENTER, | : |
| | : |
|    Defendants. | : |
| | : |

## COMPLAINT

Plaintiff, April D. Molchan ("Molchan"), by and through her undersigned counsel, brings this Complaint against Defendants Delmar Fire Department, Inc., Delmar, Delaware ("DFD"), Town of Delmar ("Delmar"), and Andrew M. Rementer ("Rementer") for violations of Title VII of the Civil Rights Act of 1964 at 42 U.S.C. §§ 2000e *et seq.* and the Delaware Discrimination in Employment Act at 19 *Del.C.* §§ 710 *et seq.*, and for intentional or negligence infliction of emotional distress and battery.

## PARTIES

1. Molchan is a citizen of the State of Maryland, who at times relevant resided at 144 Chapel Branch Road, Hebron, MD 21830.

2. At all times relevant, Molchan was an employee of Defendants DFD and Delmar as that term is defined at 42 U.S.C. § 2000e(f) and 19 *Del.C.* §710(6).

3. DFD is a Delaware corporation whose principal place of business is located at Bi-State Blvd. and Grove Street, Delmar, DE 19940, and whose mailing address is Post Office Box 143, Delmar, DE 19940.

4. Delmar is a Delaware municipal corporation whose principal place of business is located at 100 S. Pennsylvania Avenue, Delmar, MD 21875.

5. At all times relevant, DFD and Delmar were employers as that term is defined at 42 U.S.C. § 2000e(b) and 19 *Del.C*. §710(7).

6. Rementer is a citizen of the State of Delaware, who at all times relevant resided at 206 North Hantwerker Drive, Delmar, DE 19940, or at his current address of 504 East Elizabeth Street, Delmar, MD 21875.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964 at 42 U.S.C. §§ 2000e, *et seq*.

8. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all events relating to this matter took place in Delaware.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## ADMINISTRATIVE EXHAUSTION

11. Plaintiff exhausted her administrative remedies. She filed her first complaint with the Delaware Department of Labor ("DDOL") on October 3, 2017 and her second complaint on

or about January 19, 2018. DDOL issued Right to Sue Notices on both complaints on or about October 17, 2018. *See* Ex. I. the U.S. Equal Employment Opportunity Commission ("EEOC") issued Right to Sue Notices on both complaints on or about November 28, 2018. *See* Ex. J.

## FACTUAL BACKGROUND

12. Molchan joined DFD as a volunteer member in 2009 and remained a volunteer member of DFD at all times relevant to this matter.

13. Molchan was also employed by DFD and/or Delmar at all times relevant to this matter.

14. On September 8, 2015, (then) EMS Captain Molchan, (then) Fire Chief Rementer, and two other DFD officers were returning to Delmar in a DFD vehicle from a meeting in Dover when they stopped for lunch at a restaurant in Greenwood. After they were seated Rementer placed his hand high on the inside of Molchan's thigh close to her groin. Molchan immediately and forcefully told him to remove his hand which he did.

15. On July 30, 2017, Molchan was working, not volunteering, for DFD when (then) President and Second Assistant Chief Rementer applied his hand to her buttocks as he walked behind her while leaving the lounge area. When Molchan reacted, Rementer stated, "I'm sorry, I can't do that. You're paid today not volunteer."

16. At that time, DFD had never posted the notices required by both 19 *Del. C*. §716 and 42 U.S.C. § 2000e-10 of the "relevant provisions" of federal and state laws pertaining to discrimination and "information pertinent to the filing of a complaint." Moreover, Molchan was never provided with an employee handbook or any other documents describing, *inter alia*, her rights regarding sexual discrimination.

17. On August 6, 2017, Molchan spoke "off the record" about the July 30, 2017

incident to (then) DFD House Committee Chair Shawn Johnson. Molchan told Chairman Johnson that she was afraid to "write up" the incident and, in the absence of the required posting and/or handbook, was unsure about her right to make a complaint.

18.     Following Johnson's suggestion, on August 21, 2017, Molchan sent an email to (then) DFD Employment Committee Chair Wayne Knapp and (then) Fire Chief Manson Jones with her complaint letter attached to the email. Molchan subsequently sent Knapp and Jones a text message asking that they check their email for the letter.

19.     Chief Jones called Molchan who told him that she was writing up "a formal complaint" on Rementer and that she left copies of the complaint letter in Knapp's and Jones' mailboxes at the DFD station. Chief Jones asked Molchan why she sent the letter to Employment Committee Chair Knapp and she told him that it was because she was working as a part time employee at the time of the incident.

20.     Molchan attended the monthly meeting of the DFD membership on August 21, 2017. As she entered the meeting room, Chief Jones pulled her aside to tell her that there had just been a meeting at which Rementer had been told of her complaint and had been asked to resign as President. While Chief Jones and Molchan were speaking, President Rementer came by, exchanged a few words with Jones, and continued walking out of building. Jones asked Molchan what she "wanted done" and she asked Jones if they could continue the conversation after the meeting.

21.     In President Rementer's absence, members Rob Thompson and Gaylord Morris presided over that meeting, during which Chief Jones announced to the entire membership assembled that an associate member and employee (Molchan) had submitted a complaint against President Rementer for "improper conduct." Jones did not, however, state her name to the

4

membership. Thompson and Morris announced that Rementer was suspended for not more than 30 days or until the investigation was completed.

22. After the meeting, Molchan spoke with both Thompson and Morris to ask that the surveillance camera footage for July 30, 2017 be preserved before Chief Jones approached her to ask again what she "wanted done," to which she replied, "Won't the house committee meet and it will go from there?" Jones also asked Molchan where the incident took place and she told him, to which Jones replied that Rementer said it took place elsewhere, near the ladder truck. Jones persisted and Molchan told him she was not comfortable discussing the matter further at that time.

23. On August 25, 2017, Molchan submitted a complaint intake questionnaire to the Delaware Department of Labor ("DDOL").

24. On August 28, 2017, Molchan met with the DFD House Committee as requested. Present were Chief Jones, (then) Vice President and Deputy Chief Joe Morris, Jr., House Committee Chair Johnson, and members Marty Ammons, Margaret Goslee, Paul Hastings, Bob Jones, and B.J. Hughes. Apparently the committee met with Rementer as well. *See* Ex. E at p.6.

25. Molchan asked Chief Jones at that meeting who besides those present knew of her complaint, to which he replied that he had informed parliamentarians B.J. Hughes, Rob Thompson and Gary Morris when he received her letter. Also that he and Paul Hastings, Vice President Morris, Employment Committee Chair Knapp, and B.J. Hughes met with Rementer prior to the August 21, 2017 DFD membership meeting to inform him of Molchan's complaint. Molchan was questioned in a hostile and accusatory manner at that meeting, especially as to her DDOL complaint:

    a.    By Chief Jones: "Do you socialize with Andrew [Rementer] outside of the fire department?" "Why did you wait to file complaint?"

    b.    By Margaret Goslee: "Why do you think Andrew did it?" "Why did you file a complaint with the state?" "Was it against Andrew or the department?"

    c.    By Marty Ammons: "When did you file your complaint with the state?"

    d.    By House Committee Chair Johnson: "If Andrew wants to ask you a question at the regular Delmar meeting are you ok with that?" Molchan replied that she did not want any contact with Rementer, which she had also stated in her August 21, 2017 letter of complaint.

    e.    By B.J. Hughes: "Did you inform your supervisor?" Johnson interrupted Molchan's response to that question to state that Molchan had gone to him saying that she was unsure of what to do.

    f.    Molchan was also asked at this meeting if there had been other occasions when Rementer had harassed her, to which she replied, "Yes there had been many times he had made me uncomfortable. But it would be difficult to give dates when they occurred." Molchan stated emphatically to the committee that this was not a "one time touching."

26.    On September 6, 2017 the monthly DFD membership meeting convened with over 50 members present. Vice President Morris chaired the meeting. Molchan's request to have nothing to do with Rementer was ignored at this meeting. Although he was ostensibly on suspension, Rementer was already seated in the meeting room when Molchan arrived.

27.    Rementer was permitted to attend the entire meeting. However, Molchan was forced to leave the meeting when another situation involving Rementer and member Kristen Lowe was discussed. When Molchan was allowed to return to the meeting, Vice President Morris opened the discussion on her complaint against Rementer and asked Chairman Johnson to give the House Committee report.

28.    Morris directed Johnson to read Molchan's August 21, 2017 letter, including her name, to the entire membership assembled. Johnson then read the committee's report of investigation, which included both Molchan's and Rementer's accounts of the incident. The

account Rementer gave was that the incident "may have happened" by the ladder truck and that he had hit Molchan's thigh.

29. Johnson reported that the House Committee had reviewed the camera footage and the incident occurred where Molchan said it took place, and the camera footage showed that Rementer had indeed touched Molchan's buttocks as alleged. Johnson then reported that the House Committee recommended that Rementer be expelled from DFD.

30. Rementer was then given the chance to speak in his defense and he rose and walked to the front of the room while Molchan was seated in the audience. Rementer admitted that "did it" but because he and Molchan had been friends for years he did not think that Molchan would be offended. No one stopped Rementer when he then went on a tirade against Molchan; that those in DFD who know her "know that she likes things done a certain way," that she has "OCD," that she has a Type-A personality, that even before this incident he "sensed" there was tension between them, and that Molchan made this complaint out of retaliation for a disagreement they had at a prior meeting. While Rementer was speaking, Molchan was writing in her notebook and Rementer called out to her, "go ahead, write this down too."

31. Molchan was not allowed to speak until Rementer was done and sat back down. She explained that this had nothing to do with retaliation, that the incident was completely unprovoked and occurred when Rementer exited a meeting about another matter with member Kristen Lowe. Rementer then left as the meeting continued. Nothing further was done at that meeting ostensibly because there was "no proof that Mr. Rementer had been served with a copy of the charges" against him. *See* Ex. E at p. 4.

32. After the meeting, Chief Jones approached Molchan in the station and asked her if she was OK. Molchan told Jones that she was unhappy with the way Vice President Morris ran

the meeting, most especially that he forced House Committee chair Johnson to read her letter aloud to the entire membership. Jones then told Molchan that this may have been her first "offense" with Rementer, but it was not Rementer's "in general." Jones described prior "counseling" that Rementer had received because of touching other females inappropriately.

33. On September 18, 2017, the DFD membership met again and considered the matter. A member questioned whether Rementer "had been addressed before" for this type of behavior. Vice President Morris, who was presiding, stated that Rementer's past history could not be brought up. However, as questioning persisted as to Rementer's past behavior of this nature Chief Jones responded that he had addressed a complaint of the same nature - inappropriate touching - from another female member about Rementer. Jones stated that Rementer had apologized to that victim assuring her it would not be an issue again. Jones admitted that he did not document that complaint in writing even though he met with Rementer and the victim on the matter.

34. The motion to accept the recommendation of the House Committee that Rementer be expelled received a simple majority of votes cast but failed for lack of the required two-thirds (2/3) majority for expulsion due a "third offense" pursuant to Article XIII, Section 1 of the DFD Bylaws. Rementer did, however, resign his positions as President and Second Assistant Chief.

35. On October 3, 2017, Molchan and counsel met with James Billups at the Georgetown DDOL office. Billups created the Charge of Discrimination attached at Ex. A. On October 10, 2017, DDOL sent DFD the Notice of that Charge of Discrimination, in which they were directed to file a response within 20 days of receipt of the Notice. *See* Ex. B.

36. On October 16, 2017, DFD held its annual election of officers. DFD's Bylaws specify that candidates for office must prove their eligibility by submitting certain certifications

prior to the start of the meeting. That deadline was announced again by President Morris just prior to the start of the meeting. The meeting commenced and Rementer was nominated for the position of Chief Engineer. A question was raised as to whether Rementer had submitted the proper certifications prior to the start of the meeting as required, to which Rementer replied that he "had them all in his pocket." President Morris allowed the vote to proceed in violation of Bylaws Article XIV, Section 4(a). Rementer did not win the election but he was subsequently appointed to the position of Engineer, meaning that DFD returned him to a leadership position just one month after he had openly admitted to sexual harassment and battery. Then at its 2018 annual elections, Delmar elected Rementer to the position of Lieutenant.

37. Molchan received the Preliminary Findings and Recommendations attached at Ex. C from the DDOL on or about December 21, 2017. According to that document, DFD was <u>required</u> to file a "position statement" with DDOL by January 5, 2018.

38. On December 27, 2017, DFD Employment Committee Chair Keith Abbott essentially terminated Molchan by removing her from the schedule and cancelling all of the shifts that she had already been scheduled to work. Abbott also informed Delmar to remove Molchan from the payroll. Abbott told Molchan that DFD passed a Bylaw change that members could no longer work for DFD.

39. Counsel was informed by Mr. Billups at DDOL on January 15, 2018 that DFD had not filed a position statement as of that date. He also informed counsel that if Molchan had additional complaints for retaliation she should complete another intake questionnaire then her two "DDOL cases" with but the subject of a single investigation.

40. On or about January 19, 2018, Molchan submitted her second complaint to DDOL, in which she alleged termination in retaliation for the filing of her original complaint.

*See* Ex. D.

41.     On February 13, 2018, Molchan called DDOL to follow up on her complaints and was told that DFD filed a position statement on February 12, 2018, which was "too late" but would be put into her case file anyway. On February 22, 2018, counsel contacted DDOL by email regarding the DFD response and was informed that DFD had filed a position statement in response to Molchan's first complaint, Case # MOL0852517. DDOL sent counsel DFD's February 7, 2018 Position Statement, attached at Ex. E, on February 24, 2018. DFD admits in that Position Statement that:

   a.   Rementer patted Molchan on the buttocks (p.2);

   b.   Molchan timely complained to DFD (p.3);

   c.   Rementer's actions were "inappropriate" and warranted expulsion (p.3);

   d.   Molchan's charges were aired to the general membership (p.4); and

   e.   Even after Rementer admitted that he had done it, the general membership declined to expel Rementer.

42.     On March 27, 2018, Molchan filed the second complaint for retaliation, attached at Ex. F, to DDOL in person. Molchan submitted payroll information that was attached to that complaint but is redacted at Ex. F.

43.     On May 12, 2018, DDOL sent the second Charge of Discrimination to DFD, attached at Ex. G. On or about June 1, 2018, DFD filed a Response to the second complaint with DDOL, attached at Ex. H, in which it admitted that it had instructed Delmar to "remove Molchan from the payroll," but denied that it did so in retaliation for her original complaint.

44.     On October 16, 2018, Counsel wrote to DDOL again to follow up on the pending complaints and on October 17, 2018, DDOL issued the Right to Sue Notices attached at Ex. I. On November 28, 2018, EEOC issued the Right to Sue Notices attached at Ex. J.

**COUNT I - Discrimination**

45. Plaintiff is a member of a class protected against discrimination by Title VII of the Civil Rights Act of 1964 at 42 U.S.C. §§ 2000e *et seq*. and the Delaware Discrimination in Employment Act at 19 *Del.C*. §§ 710 *et seq*. Plaintiff was qualified for the position she held with Defendants; she suffered an adverse employment action; similarly situated and non-protected persons were treated more favorably and as described herein there are other circumstances that give rise to a claim for intentional discrimination.

46. The discriminatory acts and omissions of Defendants and their agents violated both Title VII of the Civil Rights Act of 1964 at 42 U.S.C. §§ 2000e *et seq*. and the Delaware Discrimination in Employment Act at 19 *Del.C*. §§ 710 *et seq*.

47. The intentional, severe and pervasive discriminatory acts and omissions of Defendants and their agents created a hostile work environment that detrimentally affected Plaintiff and would have detrimentally affected a reasonable person in like circumstances.

48. The single incident of physical contact with Rementer and its *sequelae* was severe, physically threatening, humiliating, unreasonably terminated Plaintiff's employment, and interfered with her volunteer activities with DFD. Moreover, this was not the only instance of similar behavior by DFD agent Rementer, nor was it the only time that DFD failed to properly respond to such activities by Rementer.

49. Defendants failed to provide Plaintiff with a reasonable avenue for complaint, failed to post the legally required notices of how to make a complaint, failed to protect her from Rementer, and failed to take prompt and appropriate remedial action. Not only did DFD not expel Rementer as recommended by its own investigatory committee, it subsequently returned

Rementer to a position of authority over Plaintiff which has prevented Plaintiff from resuming her avocational activities with DFD in addition to Defendants' retaliatory termination of her vocational activities there. Defendants' discriminatory acts and omissions have also had a negative impact on Plaintiff's ability to work at other area fire companies.

50. Defendants violated both Title VII of the Civil Rights Act of 1964 at 42 U.S.C. §§ 2000e *et seq*. and the Delaware Discrimination in Employment Act at 19 *Del.C*. §§ 710 *et seq*. when they terminated Plaintiff in retaliation for filing her original charge of discrimination with DDOL on August 25, 2017. DFD terminated Plaintiff and Delmar removed her from the payroll on or about December 27, 2017. Moreover, Delmar failed to determine whether DFD's Bylaw change that members could no longer work for DFD was directed specifically at Plaintiff and why it was not applied to other similarly situated members.

51. Plaintiff was engaged in protected activity when she submitted her complaint to DDOL and there was a causal connection between that protected activity and Defendants' materially adverse acts and omissions against Plaintiff. Moreover, Defendants engaged in an intervening pattern of antagonism towards Plaintiff after her complaint and before her termination, and the time period between the conclusion of their internal actions pertaining to this matter and Plaintiff's termination was only three months.

### COUNT II – Emotional Distress

52. Defendants have intentionally or negligently caused severe emotional distress to Plaintiff. Rementer, who was in a position of authority over Plaintiff when he assaulted her, engaged in conduct that was so extreme or outrageous that it exceeded the bounds of decency is intolerable in a civilized community. It is exactly this type of behavior that the fire service in particular and society in general has determined can no longer be tolerated. Even one instance is

too much. Moreover, DFD exacerbated Plaintiff's emotional distress by its subsequent handling of the incident such as almost immediately returning Rementer to a position of authority over Plaintiff in the quasi-military environment of DFD.

53. Moreover, Plaintiff fears participating in emergency activities with DFD because she fears she can no longer trust Rementer or other members to "have her back" in emergency situations. Such trust is essential to safely participate in such activities. Even when participating in such activities at places other than DFD, Plaintiff now experiences physical and mental consequences associated with fear, anxiety, and mental anguish as a result of this lack of trust and fear of reprisal against her by or on behalf of Rementer.

## COUNT III – Battery

54. Rementer's physical contact with Plaintiff on July 30, 2017 was intentional and unpermitted and was harmful and offensive to Plaintiff.

55. Defendants are vicariously liable for their agent Rementer's battery and are also liable for failing to take reasonable steps to protect Plaintiff from such battery.

**WHEREFORE**, for all of the factual reasons and legal arguments set forth herein, Plaintiff respectfully requests the Court enter judgment in her favor and against Defendants, jointly and severally, and award Plaintiff all relief for which she is entitled; including but limited to back pay, front pay, compensatory damages including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, pre- and post-judgment interest, punitive damages, attorneys' fees and costs, and such other and further relief as the Court may deem just and proper.

**SIGNATURE ON NEXT PAGE**

                                      **ELZUFON AUSTIN &**
                                      **MONDELL, P.A.**

                                      */s/ Gary W. Alderson*
                                      GARY W. ALDERSON – I.D. #3895
                                      300 Delaware Avenue, Suite 1700
                                      P.O. Box 1630
                                      Wilmington, DE  19899-1630
                                      galderson@elzufon.com
                                      Telephone: (302) 504-3231

DATE: January 15, 2019

G:\Docs\CLIENT\131840\29805\PLEADING\01323005.DOC